IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

BRENT EVERETT RYAN                              PLAINTIFF

VS.                          CIVIL NO. 1:17-CV-00128-HSO-JCG

PELICIA HALL, ET AL                              DEFENDANT

**VIDEOCONFERENCE OMNIBUS HEARING**

BEFORE THE HONORABLE JOHN C. GARGIULO
UNITED STATES DISTRICT JUDGE

FEBRUARY 26, 2019
GULFPORT, MISSISSIPPI

APPEARANCES:

FOR THE PLAINTIFF:   (PRESENT VIA VIDEOCONFERENCE)
 BRENT EVERETT RYAN (PRO-SE)
 #201257
 MISSISSIPPI STATE PENITENTIARY
 UNIT 42 EAST WARD, BED 228
 P.O. BOX 10
 PARCHMAN, MISSISSIPPI  38738

FOR THE DEFENDANT:
 BENNY MCCALIP MAY, ESQUIRE
 MISSISSIPPI ATTORNEY GENERAL'S OFFICE
 550 HIGH STREET, SUITE 1100
 JACKSON, MISSISSIPPI  39205

REPORTED BY:  SHERRI L. PENNY, RPR
              Mississippi CSR #1609
_____

2012 15th Street, Suite 403
Gulfport, Mississippi  39501
(228) 563-1751

1

2          **THE COURT:**  We are on the record, cause number

3    17:128, in the matter of Ryan versus Hall.  And in that matter,

4    is the defense ready to go forward?

5          **MR. MAY:**  We are, Your Honor.

6          **THE COURT:**  And, sir, if you could please introduce

7    yourself into the record and who you represent.

8          **MR. MAY:**  Yes, Your Honor.  My name is Mac May.  I'm

9    with the Mississippi Department of Corrections.  And make sure

10   I get the parties right here.  I am representing Pelicia Hall,

11   Jacqueline Banks, Marshall Turner, Richard Pennington, Joseph

12   Cooley, Sheneice Hartfield Evans, and Pearlie Smith.

13         **THE COURT:**  Thank you, sir.  Mr. Ryan, can you hear

14   me okay?

15         **PLAINTIFF RYAN:**  Yes, sir, I can.

16         **THE COURT:**  Good afternoon to you, sir.  I want to

17   apologize for not starting on time, I was in the middle of

18   another hearing, and it went a little bit longer than expected.

19   I know your time is valuable to you, so I apologize to you for

20   the late start, okay?

21         **PLAINTIFF RYAN:**  Not a problem.

22         **THE COURT:**  Mr. Ryan, to begin, I'll ask you, have

23   you ever been through one of these before?  You might have

24   heard it called a Spears hearing or an omnibus hearing?

25         **PLAINTIFF RYAN:**  Yes, sir.  I've been through a

1    Spears hearing with the northern district, never with the

2    southern.

3            **THE COURT:**  Okay.  Do you remember who the judge was

4    on the northern district?

5            **PLAINTIFF RYAN:**  Jane M. Virden.

6            **THE COURT:**  Judge Virden, okay.

7            **PLAINTIFF RYAN:**  Yes.

8            **THE COURT:**  Well, you know, I might do things a

9    little different from Judge Virden, so I'm going to kind of

10   explain everything to you.  I think you have a right to know

11   everything that's going on with your case, and I apologize to

12   you if I'm going to be telling you stuff you already know,

13   okay?

14           **PLAINTIFF RYAN:**  That's okay.  All right, thank you.

15           **THE COURT:**  All right.  We are here as a result of

16   the lawsuit that you filed.  And you're proceeding without the

17   payment of costs, we call that IFP, it stands for in forma

18   pauperis.  You requested to proceed that way, and I granted

19   that request to you, but that makes your case fall under the

20   Prison Litigation Reform Act.  That, in the first instance,

21   requires the Court, and when I say the Court I'm talking about

22   myself, it requires the Court to screen your case.

23           Now, what does that mean when we screen your case?

24   We're supposed to determine whether or not you've stated a

25   claim under which relief can be granted, and whether or not

1    your claim has at least an arguable basis in law and an

2    arguable basis in fact to proceed.

3              So every civil case that's filed in the United States

4    has to have at least two things, you have to have the law and

5    you have to have the facts together before the case can go

6    forward, and that's what we're going to be discussing this

7    afternoon.  Now, when I say screen the case, what does that

8    mean?  The first thing I do is I review your complaint, and

9    that's the first thing that you actually filed with the court,

10   with the federal court.  But sometimes those are a little bit

11   difficult or unclear for us to understand, so what I like to do

12   is have a hearing and actually bring you in.  Obviously, we're

13   on a teleconference right now.  But bring you in to court and

14   allow you to tell me in your own words what your lawsuit is

15   about, and how you feel each defendant, that's the people

16   you're suing, violated your constitutional rights.  You don't

17   have to state which specific constitutional right, you can just

18   say it in your own words, okay?

19             **PLAINTIFF RYAN:**  Yeah.

20             **THE COURT:**  And you and I will discuss your case.

21   Now, I listen to what you have to say.  I take that into

22   consideration along with your complaint, and then, again, I'll

23   come up with a conclusion as to whether or not your case has at

24   least an arguable basis in law and in fact to proceed.  Are you

25   with me so far?

1          **PLAINTIFF RYAN:**  Yes, sir.

2          **THE COURT:**  Okay, good.  We're also going to discuss

3     some procedural aspects to your case, some things that you may

4     or you may not be aware of, but because I'm required to

5     consider everything you say as a supplement to your complaint,

6     not an actual amendment to your complaint, everything that you

7     tell me needs to be under oath.  Are you able to raise your

8     right hand?

9          **PLAINTIFF RYAN:**  I am.

10          **THE COURT:**  Okay, I'd ask that you raise your right

11     hand and be administered the oath.

12                    (Oath Administered)

13          **THE COURT:**  Thank you, sir.  You may lower your hand.

14     Sorry, about that, Mr. Ryan.

15          **PLAINTIFF RYAN:**  That's okay.

16          **THE COURT:**  The first thing before we officially

17     proceed, and there's really not going to be anything official

18     about it, but before we actually start discussing your case,

19     you have an option to choose whether you want a district judge

20     to preside over your case or a magistrate judge to preside over

21     your case.  I've previously introduced myself to you.  I'm

22     Magistrate Judge Gargiulo.  The district judge that would be

23     assigned to your case or is assigned to your case is Judge

24     Halil Suleyman Ozerden.  Now, you're probably aware of Judge

25     Ozerden.  He's already ruled -- as a matter of fact, I think he

1    dismissed several of the defendants that you sued on this case

2    already.

3              I can tell you that there's no difference between the

4    two judges, the same procedures are going to be used, the Rules

5    of Evidence are the same, your right to appeal is the same.

6    Everything is the same right down the line with the only

7    possible difference being a magistrate judge, which is what I

8    am, can get to your case much quicker than a district judge,

9    all right?  So do you understand the difference between the two

10   judges?

11             **PLAINTIFF RYAN:**  Yes.  Yes, I do.

12             **THE COURT:**  And I'll tell you, you're not going to

13   make Judge Ozerden upset if you decide to go with me, and

14   you're not going to make me upset if you decide to go with

15   Judge Ozerden.  We both have plenty of cases and lots to do,

16   you're not going to make either one of us angry.  Again, the

17   only way it would affect you is a magistrate judge can get to

18   your case much quicker that a district judge.  So with that

19   being said, would you consent to a magistrate judge presiding

20   over your case?

21             **PLAINTIFF RYAN:**  No, sir.  I actually wrote a letter

22   to the court, to the court clerk, and told her I'd rather have

23   the district judge take it.

24             **THE COURT:**  All right, sir.  And just out of sheer

25   curiosity for my own edification, what went into that decision?

1    **PLAINTIFF RYAN:**  Well, to be honest with you, I have

2    been waiting for this hearing for about two years, and I've

3    only heard from Judge Ozerden one time, and I've heard from you

4    a few times.  So I want to try somebody new, you know.  Just

5    being honest with you.

6        **THE COURT:**  So you want to go with Judge Ozerden?

7        **PLAINTIFF RYAN:**  Yes, sir.

8        **THE COURT:**  Okay.  All right.  That's fine.  Now,

9    I'll tell you I'm still going to be involved in the case, and

10   I'm still going to conduct the hearing.  And I will also decide

11   the discovery issues, as well as other issues in the case.

12       **PLAINTIFF RYAN:**  Okay.

13       **THE COURT:**  I wanted to bring up just a couple other

14   aspects to your request with you.

15       **PLAINTIFF RYAN:**  Yes.

16       **THE COURT:**  I, like most good judges, bring my staff

17   in here with me, and you saw us do it a little bit earlier, if

18   you happen to see them hand me a document or anything like that

19   or a Post-it, Mr. Ryan, I don't want you to think we're talking

20   bad about you or anything like that.  They're simply probably

21   telling me something I should've done that I didn't do, okay?

22       **PLAINTIFF RYAN:**  Yeah, I understand.

23       **THE COURT:**  Okay.  Second thing is I notice that

24   you've requested a jury trial; is that correct?

25       **PLAINTIFF RYAN:**  Yes, sir.

1            **THE COURT:**  All right.  And that's entirely up to

2     you.  I would tell you that if a jury were brought in on this

3     case, the Court would not be allowed to relax the Rules of

4     Evidence, okay?

5            **PLAINTIFF RYAN:**  I understand.

6            **THE COURT:**  You would be held to the same standard as

7     a trained and experienced attorney, a practitioner.  And Judge

8     Ozerden would not be allowed to relax those rules just because

9     you're representing yourself.  Now, if you were to request a

10    bench trial instead of a jury trial, Judge Ozerden would serve

11    as the jury.  And in that event, he would be allowed to relax

12    the Rules of Evidence.  Do you understand that?

13           **PLAINTIFF RYAN:**  Yes, I do.  I do.

14           **THE COURT:**  I would also tell you, sir, that if a

15    jury were brought in, they would be aware that you are a

16    prisoner, do you understand that?

17           **PLAINTIFF RYAN:**  Yes, I do, sir.

18           **THE COURT:**  And I can tell you, to my knowledge,

19    felons are not allowed to serve on jury duty, so I'm not sure

20    how a jury would receive the fact that you are a convicted

21    felon, so I'm just telling you that --

22           **PLAINTIFF RYAN:**  I understand.

23           **THE COURT:**  Okay.  Now, on the flip side, Judge

24    Ozerden has been dealing in the criminal law field, and I can

25    assure you the fact that you're a convicted felon would not

1    weigh in to his decision if you were to decide to go with a

2    bench trial instead of a jury trial, all right?

3            **PLAINTIFF RYAN:**  I understand.

4            **THE COURT:**  The last thing I would tell you is there

5    is a process of jury selection, it's called voir dire, voir

6    dire, depends on how you want to pronounce it.  And I can tell

7    you that it's not the easiest of processes.  It, in a sense, is

8    when you would be picking the jurors who would decide your

9    case.  Attorneys are trained on how to do this and go through

10   -- and are experienced on how to do this.  No one would be able

11   to help you pick the jury if you were to select or continue

12   with your request for a jury trial.  So the judge would not be

13   able to help you.  You would, in essence, be picking a jury

14   against an attorney that's trained on how to do it and is

15   experienced on how to do it.  But if you were to waive that

16   jury demand and instead go with a bench trial, you wouldn't

17   have to worry about that jury selection.  Do you understand

18   that?

19           **PLAINTIFF RYAN:**  Yes, sir.  I just have one question,

20   how many challenges and -- how many challenges and things like

21   that in voir dire do I have?

22           **THE COURT:**  Now, that's something that -- I couldn't

23   give you the advice on that, all right?  The Court can't assist

24   you on that.  And that's something --

25           **PLAINTIFF RYAN:**  I'll read the rules, sir.

1       **THE COURT:**  I'm sure you will.  I'm telling you that

2   there as another option, and that would be to have the judge

3   preside as the jury on your case.  The last aspect to your

4   request for a jury trial is jury instructions, all right.  Each

5   of the parties give the judge their proposed jury instructions

6   for the juries to be charged.  And again, I would tell you

7   attorneys are trained on how to do this, and there's a lot of

8   research that's involved in it.  No one would be able to help

9   you select or craft your jury instructions if you were to go

10  forward with a jury demand; however, if you were to waive the

11  jury demand and proceed with a bench trial, there would be no

12  need for the jury instructions, do you understand that, sir?

13      **PLAINTIFF RYAN:**  Yes, sir.

14      **THE COURT:**  All right.  And with that being said, are

15  you still requesting a jury trial?

16      **PLAINTIFF RYAN:**  Yes, sir.

17      **THE COURT:**  Okay.  All right, sir.  Well, I have read

18  your complaint, but what I would ask you to do, again, is

19  discuss with me why you're suing the individual defendants --

20  now, Judge Ozerden has already dismissed quite a few of the

21  defendants that you -- claims, I'm sorry, not defendants,

22  claims.  So what I'd like to do is limit this hearing to the

23  claim, I think the one claim, ventilation and exercise time,

24  that Judge Ozerden allowed to go forward.

25      So with that being said, if you could please speak to

1    me about your basis for your lawsuit as it pertains to -- we'll

2    start with the exercise time.

3         **PLAINTIFF RYAN:**  Okay.  First of all, I want to say

4    that it's not -- the Court is overlooking the number one

5    cornerstone of my amendment problem.  It's First Amendment

6    right to access the courts.  Mr. Thomas Cooley, or Richard

7    Pennington and Joseph Cooley were put in there because I have

8    tried to exercise the ARP program for multiple years, and have

9    only received three complete ARP processes.  The rest of the

10   time they have usurped or cut off my ARP process in some way,

11   shape or form, or simply lost my ARPs.

12        **THE COURT:**  And I don't mean to interrupt you, Mr.

13   Ryan, but the claim that you're talking about right now --

14        **PLAINTIFF RYAN:**  Yes.

15        **THE COURT:**  Judge Ozerden dismissed that claim.

16        **PLAINTIFF RYAN:**  Okay.

17        **THE COURT:**  I know you said you wanted to try a new

18   judge out because you haven't heard much from him, but in his

19   order that you did hear from him he dismissed that claim.

20        **PLAINTIFF RYAN:**  Yes.  Okay.  Well, I wasn't sure if

21   the Court had even seen it because I didn't remember reading

22   about it in any of my orders.  With that being said, I will go

23   with the exercise time.  Sir, from January of 2016 until

24   January of 2018, I was at SMCI prison.  And there you should

25   get yard call maybe once a day, sometimes four or five times a

 1   week.  During my two years there, I only received approximately

 2   17 yard calls in two years.  Sir, the last time I have left a

 3   DOC building was March 31st of 2017.  I've not been outside,

 4   until today, since March 31st, 2017.  And I believe that's not

 5   Constitutionally sound.

 6           **THE COURT:**  Let me ask you this.  Now, January of

 7   '16 to January of '18, where were you housed?

 8           **PLAINTIFF RYAN:**  I was -- Area 2 at SMCI.

 9           **THE COURT:**  And where are you currently?

10           **DEFENDANT:**  At Mississippi State Penitentiary, Unit

11   42, Hospital Ward.  And I understand that in a hospital ward, I

12   am a quadraplegic now, I can't move my arms or legs, so it

13   really wouldn't do much good for me to go outside now.  But

14   before this happened, I was begging to go outside and we'd

15   never get out.  We'd never get out of the building.

16           **THE COURT:**  That's my question to you, Mr. Ryan.

17   January the 16th to January -- I'm sorry, January of 2016 to

18   January of 2018, were you a quadraplegic at that time?

19           **PLAINTIFF RYAN:**  No.  January 23, 2018, I was

20   assaulted while sleeping, and they broke my neck.  And since

21   then, I've been a quadraplegic.

22           **THE COURT:**  I'm sorry that that happened to you, sir.

23           **PLAINTIFF RYAN:**  It's okay.  And you know, that's

24   just one of the many, many problems that I see.  But since

25   we're just talking about those two, I would say the ventilation

1   was a really bad problem due to the fact that it's really not

2   safe at Greene County, SMCI, it's really not a safe building.

3   They're understaffed, they're overworked.  And they have one

4   staff member for every 200 inmates.  And when an inmate wants

5   to assault another inmate or whatever, there's no ventilation

6   in the building, so they turn the hot water on and fog up the

7   window to the guard tower.  So they can do whatever they want,

8   talk on the phone, smoke drugs, whatever, or kill somebody, and

9   there's nobody in there to see what's going on.  And so I saw

10  that happen multiple times, and I figured somebody has to do

11  something about this.  That's the only reason why I filed suit,

12  sir.  I mean, this is not my idea of fun.  It's very tedious,

13  horrible job having to sue somebody.  A very tedious job,

14  but --

15          **THE COURT:**  I understand that.

16          **PLAINTIFF RYAN:**  I felt I needed to do it.

17          **THE COURT:**  So the ventilation claim, are you filing

18  that on behalf of other people?

19          **PLAINTIFF RYAN:**  Not now.  I'm filing it on behalf of

20  the time I was there.

21          **THE COURT:**  Okay.

22          **PLAINTIFF RYAN:**  And I'm also in a building right now

23  with no ventilation.  The room I'm at MSP, which just checked

24  on December 21st, and they have no ventilation in the room that

25  I'm in.  So this is not just strictly for SMCI, there seems to

 1   be a problem that is all of Mississippi, so --

 2          **THE COURT:**  Okay.

 3          **PLAINTIFF RYAN:**  I'm kind of --

 4          **THE COURT:**  The exercise time claim that you filed --

 5          **PLAINTIFF RYAN:**  Yes.

 6          **THE COURT:**  As I appreciate it, you said you were

 7   only allowed out on yard call 17 times between January of 2016

 8   to January of 2018; is that correct?

 9          **PLAINTIFF RYAN:**  Yes.  And that's just an estimate,

10   sir, because MDOC has all of my property.  They have not given

11   me any of my property.  I just received an ARP yesterday, was

12   the first time where they actually admitted that they lost my

13   property.  So I don't have any of my paperwork.  All the

14   papers, years of studying, hours of researching, jeopardizing,

15   doing all this hard work is gone because MDOC didn't want to

16   give it to me, so I'm just guessing.  But I had a log.  I had a

17   log every day, whether I went out the building, whether I went

18   to the doctor, whether I went to the chapel, wherever I went I

19   kept a log, and MDOC now has it, and I'm no longer allowed to

20   get it.  You see what I mean?  I don't know what else to do,

21   sir.

22          **THE COURT:**  Yes, sir.  I understand.  Well, we're

23   going to have process of discovery, I anticipate, in this case,

24   okay?

25          **PLAINTIFF RYAN:**  Okay.

1          **THE COURT:**  The fact that you only had approximately

2     17 yard calls, was that unique to just you, or did other people

3     get more yard calls?

4          **PLAINTIFF RYAN:**  Well, you see, here is the deal.  It

5     is seven buildings, okay.  And in the seven buildings, they're

6     locked up in three different sections.  Well, the D Building,

7     D1 and D2, is a section, that's 200 people apiece, so that's

8     400 people.  They may get yard call twice a week; whereas C1

9     and C2 may not never get yard call.  And we'd ask them, hey --

10    because the older people aren't going to cause any problems,

11    they're not going to start any fights, and that's where the

12    older individuals are housed.  Older people, sicker people are

13    housed in the D Building, and they're just less problems, so

14    they are more likely to get out than the people who are housed

15    in general population, you know, that could be a problem.  And

16    they just really don't want to deal with it, so they don't let

17    us out of the building.

18         **THE COURT:**  All right.  So you don't think that you

19    were isolated in this -- you believe it's, say, a practice, a

20    custom or a policy?

21         **PLAINTIFF RYAN:**  Yes, yes.  Exactly.

22         **THE COURT:**  All right.  Now, just speaking as to your

23    exercise time claim, how did it adversely affect you that you

24    only got yard call approximately 17 times during that time

25    span?

1          **PLAINTIFF RYAN:**  All right, well to be -- to be frank

2     with you --

3                         (OFF RECORD)

4          **THE COURT:**  Mr. Ryan, can you hear me?

5          **PLAINTIFF RYAN:**  Yes.  Yes, I can.

6          **THE COURT:**  What I'm going to do -- wait one second.

7          **PLAINTIFF RYAN:**  Go ahead.

8          **THE COURT:**  What I'm going to do is I'm going to ask

9     the court reporter to state where you left off, all right.  And

10    madam court reporter, if you could please --

11                    (Previous question read back)

12         **THE COURT:**  Mr. Ryan, where we left off before there

13    was an electronic breakdown in our telecommunication, I had

14    asked you with regard to the exercise time claim, how did it

15    adversely affect you.  And you were just beginning to respond.

16    You said, to be perfectly frank, and then the audio cut off, so

17    you may proceed.

18         **PLAINTIFF RYAN:**  To be perfectly frank with you, it's

19    just not psychologically good to be stuck in a building 24

20    hours a day around the same 100 seriously violent -- and, you

21    know, it's just not safe, it's not -- it doesn't help your

22    depression at all.  I started getting depressed, I couldn't

23    eat.  It got to where, you know, just being around all the

24    smoke and constant fighting, that's just not good.  I began to

25    lose my mind.  And I put in a medical slip for that, you know

1    what I mean, I did what I could to try to tell them that this

2    was a problem stemming from no outside exercise.  And they just

3    did nothing.

4              **THE COURT:**  Okay.  So you did seek medical attention

5    for depression?

6              **PLAINTIFF RYAN:**  Yes, yes.

7              **THE COURT:**  All right.  And were you treated for

8    depression?

9              **PLAINTIFF RYAN:**  Yes, but they wanted to put me on

10   psychotropic medicine, and I -- I don't mind Prozac or Lexapro

11   or some mild antidepressant, that would've been fine, but I

12   will not be put on Seroquel or Trazodone, these really big

13   downers that can literally ruin your brain.  I'm not a big fan

14   of psychotropics.

15             **THE COURT:**  Okay.

16             **PLAINTIFF RYAN:**  Basically --

17             **THE COURT:**  Go.

18             **PLAINTIFF RYAN:**  I was going to say, basically, they

19   just said, you know, it'll be all right, keep your eyes -- and

20   that's what I did.  I tried to stay in my Bible, stay studying

21   and doing the law.  That's where I got my -- passed my time.

22             **THE COURT:**  All right.  Now, you're suing Pelicia

23   Hall, who is the commissioner.  Why are you suing Pelicia Hall?

24             **PLAINTIFF RYAN:**  Simply because she is in charge of

25   all institutions within the State of Mississippi.  And at first

1    I wasn't sure if she would be immune or anything, but when it

2    comes right down to it, she has a responsibility for each and

3    every facility within her -- within her state.  And I felt as a

4    commissioner, she could've done something, too.  And I wrote

5    her multiple letters.  Wrote her letters, sent letters to

6    anybody, anybody that would listen asking for help because this

7    is a seriously bad problem and needs to be fixed, and I'm not

8    sure how else we can fix it, you know?

9            **THE COURT:**  Well, I guess before we get into the

10   individual defendants, let's speak to your ventilation claim.

11           **PLAINTIFF RYAN:**  Yes.

12           **THE COURT:**  Tell me about that.

13           **PLAINTIFF RYAN:**  The ventilation -- first of all,

14   when I was in Building C-2, which was the first year, 2016, the

15   ventilation was okay.  I thought it was horrible -- but they

16   only had one fan for 100 people, one 42-inch fan to blow on 100

17   people, and it's literally impossible.  So it gets hot in

18   there.

19           Mississippi is probably the hottest state in the

20   Union.  And when you get the aluminum buildings getting over

21   100 degrees, it can be up to 115, 120 inside those.  And we had

22   a thermostat on the wall there.  And after I saw that, you

23   know, people taking showers all day to try to cool off, but

24   that just brings up the humidity.  And the ventilation was a

25   major problem because the steam wouldn't go anywhere.  So I

1   feel like the ventilation was a major problem because the

2   smoke, the steam, humidity, and just pretty much the airflow,

3   you know.  It's very hard to live in a smoked-out, hot, steamy,

4   muggy place, it's just unbearable.

5          **THE COURT:**  Now --

6          **PLAINTIFF RYAN:**  That's all.

7          **THE COURT:**  Your ventilation claim, is that limited

8   for that one year in 2016?

9          **PLAINTIFF RYAN:**  No, sir.  No, sir, because when I

10  moved in 2017, February 8th, 2017, I moved to Building C1,

11  which is right next door.  And I thought C2 was bad until I

12  moved to C1.  Turns out C1 is even worse.  They have

13  half-working fans, it only works about half the time.  It's

14  still the same, one fan for the whole 100 percent people.  So

15  I'm writing ARPs, I'm doing everything I can to try and fix

16  this problem, and I'm literally just ignored.  Well, they told

17  me the fans were on order.  And I waited six, eight months for

18  the fans to come, and they never came.

19          It's just horrible to try to live in a facility with

20  no air conditioning and no fans, no ventilation.  I don't even

21  think it's safe.  So when I moved to C1, it was even worse.

22  Then they moved me to A2.  That was even worse.  That's the

23  worst building I ever been in.  And then I moved to B1, which

24  is the final place I was at, and it was a little better by then

25  because they had the fans at that time.  They had received some

 1    fans, so it was a little bit better.  And plus it was the

 2    wintertime, so I can't adequately say how the summers in B1

 3    would've been.  I know throughout '16 and '17 it was miserable.

 4            **THE COURT:**  So the fans ultimately came in?

 5            **PLAINTIFF RYAN:**  Yes.  In August of 2017, I believe

 6    it was August, don't stick me with that, but I believe it was

 7    August of 2017, they did finally bring in three more fans.  So

 8    that's a total of four fans for each zone.  So by -- and

 9    believe it or not, it helped a lot, but there's only so much

10    you can do with no fresh air coming in, no ventilation and

11    fresh air actually coming in.  It's just blowing around hot

12    air.  Blowing around hot air is a lot better than no movement

13    of the air, you know, so I can't -- I did write the courts and

14    let them know everything that was going on.  I wrote the courts

15    and let them know what was going and let them know that we just

16    received fans.  I let the court know, I'm not trying to get

17    some money off the state.  I'm simply trying to fix a seriously

18    broken problem.

19            **THE COURT:**  So as to the ventilation, isn't the

20    problem fixed?

21            **PLAINTIFF RYAN:**  No.  They did put fans in, but they

22    seriously need to go in and clean the return vents.  They are

23    so filthy and clogged up, there's no fresh air coming in.  You

24    see what I mean?  I know with -- I'm not an air specialist, but

25    I know what a velometer is.  It's a little machine they stick

 1    up to the vents and see if it's working.  And the velometers

 2    are picking up no return air out of any of the showers or

 3    bathrooms, and that's the biggest problem.

 4         **THE COURT:**  So you've actually -- you've used one of

 5    those devices?

 6         **PLAINTIFF RYAN:**  Yes, yes.  I used to be a hand, just

 7    helping somebody, but he explained to me exactly what a

 8    velometer is.  And when I see them, I'll just, hey, come here,

 9    you know, does it work on this vent, is this vent working in?

10    And I've actually seen -- because they do have to do

11    inspections and things like that, so I've actually seen the

12    people that inspected.  And I've actually seen the velometer

13    reading out zero, zero, zero.  It's not getting no fresh air

14    coming in, you know?

15         **THE COURT:**  Who did you do that reading with?

16         **PLAINTIFF RYAN:**  I'm not sure his name, but the most

17    recent one was December 21, this last December, just not too

18    long ago.

19         **THE COURT:**  And who was that with?

20         **PLAINTIFF RYAN:**  I'm not sure of the name, but he was

21    here at MSP.  They did it right there in my room.  And I said,

22    hey, will you check that return vent and see -- he said the

23    reading is zero.  I'm not sure.  I'm sure the defendants could

24    tell you exactly who it was.  I asked him who he was, he said

25    he worked for a private company.  I said okay.  He didn't

1    really want to talk to me, and I understand, he's just there to

2    do the job.

3              **THE COURT:**  What job was that person doing?

4              **PLAINTIFF RYAN:**  Inspecting.  He was inspecting the

5    ventilation, I guess, the vents for each room in the hospital.

6              **THE COURT:**  So it would've been an inspector?

7              **PLAINTIFF RYAN:**  Yeah.  And that's what I said, he

8    was an inspector.  I'm not sure what the name of the company

9    was, but he was inspecting on December 21, Unit 42 at about

10   noon.

11             **THE COURT:**  Say that one more time.

12             **PLAINTIFF RYAN:**  December 21 at approximately noon,

13   and he was in Unit 42 here at MSP.

14             **THE COURT:**  All right.  So as to the ventilation

15   claim, as I appreciate it, you requested fans.  You filed an

16   ARP with regard to the fans.  Ultimately they got the fans, but

17   it is your position that more is required?

18             **PLAINTIFF RYAN:**  Yes.  And like I said, I'm not

19   trying to just -- I'm not trying to throw salt on a wound, but

20   it's like putting a Band-Aid on a bullet hole, sir.  There's

21   only so much you can do, those fans can do if you're not

22   getting any fresh air coming in, you know.  And while I do

23   appreciate having more air going around, it's still very hot,

24   it's still miserable.  You know, nobody likes to listen to a

25   guy who is in prison, so here we are.

1          **THE COURT:**  And then as to the exercise time, as I

2   appreciate it, you feel like you should be allowed out more

3   than you were allowed out for yard call?

4          **PLAINTIFF RYAN:**  Yes.  Each person -- you know, I

5   can't remember the case law, but I have it in some of my

6   motions, that you should get anywhere from three to five days a

7   week outside, if just for an hour, you know.  People on death

8   row get an hour, you know what I mean?  Everybody should be

9   entitled to a little bit of sun in their life.  And to be

10  honest with you, I haven't been outside in years.  And it's

11  very tolling on your psychological and physical body, you know.

12         **THE COURT:**  How did the ventilation claim, how did

13  that adversely affect you?

14         **PLAINTIFF RYAN:**  I can't say that the ventilation

15  gave me tuberculosis or anything like that.  It didn't do

16  anything physically to me; however, psychologically it did.  To

17  be hot and humid and stuck inside of a building 24 hours a day,

18  seven days a week is psychologically tolling on a person, you

19  know.

20         **THE COURT:**  Did you seek any medical or mental care?

21         **DEFENDANT:**  I did put in a few -- yeah, I did put in

22  a few requests for mental health.  And they basically told me,

23  you just got to cheer up, man, look on the bright side, stay in

24  the Bible.  I appreciate the good pep talks and everything, but

25  it's very, very hard, sir, very hard.

1          **THE COURT:**  I can appreciate that.  I understand, I

2     don't disagree with you.  Did they offer any medication?  Was

3     that the same as with your exercise when they offered you

4     medication for depression?

5          **PLAINTIFF RYAN:**  No, sir, they didn't offer me any

6     medication.  They just basically told me, got to cheer up, it's

7     hot outside anyway, you don't need to be out there.  They

8     didn't offer me any -- they basically just -- pat on the back,

9     told me to drink some water and move on.

10          **THE COURT:**  Now --

11          **PLAINTIFF RYAN:**  I don't know what else I could do.

12          **THE COURT:**  As to commissioner Pelicia Hall, are you,

13     in essence, suing her on both of these claims just because of

14     her title, she's the commissioner?

15          **PLAINTIFF RYAN:**  Exactly, because she has the power

16     to dictate what goes on and where the money goes and how it's

17     spent.  You know, I see her as kind of responsible because, you

18     know, I understand -- I can say this, and this is God's honest

19     truth, they have changed the superintendent, they have changed

20     the warden of SMCI, so they're obviously trying to fix

21     problems, but that didn't help me for the years that I was

22     there, you know.  It didn't help me for the time that I was

23     there.  And I just felt like she could've helped me, and I

24     wrote her many letters and asked her for help.

25          **THE COURT:**  Have you ever met her personally?

1          **PLAINTIFF RYAN:**  No, sir.  No, sir I have not.

2          **THE COURT:**  You're not alleging that she's got like

3     some sort of a personnel vendetta against you for some reason,

4     are you?

5          **PLAINTIFF RYAN:**  No, sir.  No, sir.

6          **THE COURT:**  Jacqueline Banks, I understand, is the

7     superintendent at SMCI?

8          **DEFENDANT:**  Yeah, she was.

9          **THE COURT:**  She was.

10         **PLAINTIFF RYAN:**  She no longer is.  Yeah, she was,

11    she no longer is.  I just found that out yesterday.  She was

12    the main person who could do anything within her power to say,

13    hey, these guards, y'all guards need to get up, you need to

14    step up and start giving people more rec time, you need to fix

15    those ventilation things.  She could've called maintenance and

16    had them come clean out the vents and see what's going on, but

17    she just really didn't.  She just ignored the problem.

18         **THE COURT:**  And same question to you about her, you

19    ever met her personally?

20         **PLAINTIFF RYAN:**  No, sir.  No, sir.

21         **THE COURT:**  You don't feel like she's got some

22    personal vendetta against you individually?

23         **PLAINTIFF RYAN:**  No, I don't believe so.

24         **THE COURT:**  And are you suing her, in essence,

25    because of her title, she was the superintendent?

1              **PLAINTIFF RYAN:**  Yes, and because I wrote her

2    multiple letters and multiple ARPs attempting to solve the

3    problem, and they simply got ignored.

4              **THE COURT:**  Okay when you say ignored, did they ever

5    respond to those ARPs?

6              **PLAINTIFF RYAN:**  Sometimes, but most of the time they

7    simply disappeared.  The ARPs just disappeared.  And that's why

8    I'm really upset about my property because I had hand copies of

9    everything I write.  I write a lot.  And everything that I

10   would write I would keep a hand copy or rough draft or some way

11   to prove that I wrote this on this day.  And now I have no

12   proof, no nothing, and MDOC -- now, I'm going to have to pay --

13   just for this litigation right here, I'm going to have to pay

14   to get my whole file, 50 cents a page, I'm going to have to pay

15   for each and every thing.  I spent years doing this, thousands

16   of hours of research trying to figure out a way to fix the

17   problem, and I simply -- they stop me the every turn.

18             **THE COURT:**  Who is Marshall Turner?

19             **PLAINTIFF RYAN:**  He was the warden.  He is now the

20   superintendent at the prison I'm at right now, but he was the

21   warden of Area 2.  And I did meet him personally.  I did know

22   him, I seen him on the yard and stuff.  And each time I saw him

23   I'd ask him -- he would say he was going to help us, he's going

24   to -- we're going to talk with the guards and see if we can get

25   y'all some rec time, I'm gonna do this, and I'm gonna do that,

1    but it simply never happened.  I'm not sure if he dropped the

2    ball or someone else did, but I felt as the warden of Area 2,

3    it's his responsibility -- and what really makes me aggravated

4    was because the D Building, D1 and D2, they received rec time

5    three or four times a week, no problem.  But because of the

6    security issue or whatever issue, you know, they simply didn't

7    want to let us out.

8         **THE COURT:**  And I'm not putting words in your mouth,

9    but you said you asked for yard time and they just didn't do

10   it.  You did receive yard time, just not what you consider to

11   be Constitutionally adequate?

12        **PLAINTIFF RYAN:**  Yes, we did receive it.  Very

13   rarely, 17 times in two years, that's 720 days.  17 times just

14   not gonna cut it.

15        **THE COURT:**  And again, Marshall Turner, you feel like

16   Marshall Turner has got a personnel vendetta against you or are

17   you basically suing because of his title as the warden?

18        **PLAINTIFF RYAN:**  Yes, I'm simply suing him because he

19   was the warden over Area 2 at that time.

20        **THE COURT:**  I see where Richard Pennington is being

21   sued.  What does Richard Pennington have to do with ventilation

22   or exercise time?

23        **PLAINTIFF RYAN:**  He does not.  He is the person that

24   had to do with the processing of my ARPs, and he's the ARP

25   director.  And he personally has said to my case manager here,

1    he said, do not help this guy in any way, shape or form, he's

2    got lawsuits pending, you know.  So I do believe he has a

3    personnel vendetta against me, but we're no longer speaking

4    about those grounds, so I can't --

5              THE COURT:  Okay.  Would you voluntarily withdraw

6    your claim against him since the District Judge Ozerden has

7    dismissed those claims?

8              PLAINTIFF RYAN:  Yeah, I guess I'm gonna have to for

9    expediency purposes.  That's okay.  We'll do that to save

10   myself some --

11             THE COURT:  I guess just for the record I need to

12   confirm you're voluntarily dismissing it, at least that

13   defendant?

14             PLAINTIFF RYAN:  Yes.  Yeah.

15             THE COURT:  Now, I also see where we're suing Joseph

16   Cooley.  What does Joseph Cooley have to do with exercise time

17   or ventilation?

18             PLAINTIFF RYAN:  Nothing, he was also the -- he is

19   what they call the ARP investigator, and he investigates.  So

20   we're going to go ahead and dismiss that claim also, or dismiss

21   that defendant also.

22             THE COURT:  All right, sir.  Now, I see where you're

23   suing Pearlie Smith?

24             PLAINTIFF RYAN:  I was, but the district judge had

25   already dismissed the claim for reasons unknown to me.  But the

1    district judge has already dismissed it, so we'll dismiss that

2    defendant, also.

3              **THE COURT:**  All right.  And then I see, maybe it's

4    pronounced Sheneice, I think, Sheneice Hartfield Evans?

5              **PLAINTIFF RYAN:**  Yes.  Same thing, dismiss that

6    defendant, also, for expediency purposes.

7              **THE COURT:**  So just so we're clear right now, the

8    defendants in the lawsuit that you're suing on the exercise

9    time and the ventilation are commissioner Pelicia Hall,

10   Superintendent Jacqueline Banks, and the former Warden Marshall

11   Turner; is that correct, Mr. Ryan?

12             **PLAINTIFF RYAN:**  That is correct, sir.

13             **THE COURT:**  Mr. Ryan, I apologize I didn't tell you

14   this earlier, but I'm going to give the defense attorney an

15   opportunity to ask you some questions, all right?

16             **PLAINTIFF RYAN:**  That's okay.

17             **THE COURT:**  Normally, I would've told you on the

18   front end so you don't feel like you're blindsided, but I'm

19   about to allow the defense counsel to ask you some questions.

20   And, counselor, if you're ready to proceed you may, sir.

21             **MR. MAY:**  Thank you, Your Honor.  Mr. Ryan, regarding

22   your exercise time claim, have you been diagnosed with any type

23   of physical or mental ailment that's been directly attributed

24   to a lack of exercise time at SMCI?

25             **PLAINTIFF RYAN:**  Simply depression.

1          **MR. MAY:**  So has someone diagnosed with you

2    depression, and they have said the cause of your depression is

3    a lack of exercise time?

4          **PLAINTIFF RYAN:**  Yes.

5          **MR. MAY:**  And who did that?  I'm sorry.

6          **PLAINTIFF RYAN:**  I imagine his name is -- it's okay.

7    I'm not sure of the doctor's name.  The older guy there at

8    SMCI, I can't remember his name.  I'm sorry, sir, it's been a

9    year and a half.  He is the only --

10          **MR. MAY:**  Your testimony --

11          **PLAINTIFF RYAN:**  I'm sorry.  He is the only doctor

12    there.  I'm sorry.

13          **MR. MAY:**  Your testimony is that a doctor at SMCI, an

14    older doctor, told you you're depressed, and you're depressed

15    because you haven't been getting adequate exercise time?

16          **PLAINTIFF RYAN:**  Yes.

17          **MR. MAY:**  But you don't know the name of the doctor?

18          **PLAINTIFF RYAN:**  No, I can't remember his name.  He

19    is the oldest doctor we got there, him and -- for the life of

20    me, I cannot remember his name.

21          **THE COURT:**  Was this doctor --

22          **PLAINTIFF RYAN:**  If it'll help you, he was

23    actually -- in the grounds that the judge dismissed, he was one

24    of the defendants that was dismissed, also.  And he worked for

25    Centurion Medical Services.  So I don't have any property on

1    myself, but you have the motions right there in front of you,

2    you can find his name.

3              **MR. MAY:**  So you're saying there was a doctor that

4    was a defendant who was dismissed, and that doctor told you at

5    some point that you had depression, and that depression was due

6    to a lack of exercise at SMCI?

7              **PLAINTIFF RYAN:**  Yeah.  He told me I was depressed.

8    Now, the reason why I went to see him was because I wasn't

9    getting any yard time, and you know, I couldn't eat and things

10   like that.  And so he put me on Prozac, which is for

11   depression, but he never said that the reason why he was

12   putting me on it is because I'm depressed I didn't get yard

13   time.  He just simply said, you're depressed, and here is my

14   medicine for it.

15             **MR. MAY:**  Were there any other causes, in your

16   opinion, in your lay opinion, for your depression?

17             **PLAINTIFF RYAN:**  No, sir.

18             **MR. MAY:**  Not the fact that you're incarcerated for

19   25 years?

20             **PLAINTIFF RYAN:**  While it is depressing, I actually

21   do have faith in the justice system, and I know that I didn't

22   commit the crime, so I know I'll get out.  It's not a problem.

23             **MR. MAY:**  Okay.  Same question for the ventilation

24   issue.  Has any doctor told you that you're suffering from some

25   physical or mental ailment, and that that ailment is due to a

 1    lack of ventilation at SMCI?

 2          **PLAINTIFF RYAN:**  No.  I can say that, but no doctor

 3    would blame that on the ventilation, but psychologically it is

 4    very tolling to have no ventilation in a building with a bunch

 5    of hot, sweaty men, in 100 plus degrees for months at a time

 6    and was never being let out of that building.  Psychologically,

 7    it's tolling.  That's all I can say.

 8          **MR. MAY:**  Mr. Ryan, when you speak of a lack of

 9    ventilation, are you primarily talking about heat, the heat in

10    the building?

11          **PLAINTIFF RYAN:**  No, sir.  I'm referring to the heat

12    and the fresh air.  Lack of fresh air return vents, return

13    ducts on a ventilation system.  You know, you got one system

14    blowing air in, you got one system sucking it out.  And when

15    people are putting out, working out, doing things like that,

16    they're putting out a lot of heat.  And you need those return

17    vents to suck that hot air out and blow some fresh air in.  I'm

18    not just referring to the temperature, although that does get

19    miserable, I'm simply referring to the return vent intake, you

20    know.

21          **MR. MAY:**  Okay.  Your Honor, I don't have any further

22    questions.  I do have some -- I did not bring the documents

23    because I've got a large stack of documents in my office

24    related to Mr. Ryan's confinement, and I wanted to ask the

25    Court and Mr. Ryan what we would need to produce.  Of course, I

1   have the usual documents, institutional records, which is a

2   very small stack.  The medical records are very large.  Most of

3   those are postdate his time at SMCI.  But I've got in the

4   neighborhood of about 1,200 medical -- pages of medical

5   records, and then some ARP documents and sick-call requests.

6   I'm happy to produce whatever the Court determines necessary.

7               **THE COURT:**  I think I'm looking at the precedent

8   case-law.  In order to develop the claims, we probably need a

9   full disclosure.

10              **MR. MAY:**  Okay.

11              **THE COURT:**  Mr. Ryan, I'm going to order that the

12  defense mail to you your discovery, all right?  And you heard

13  the defense attorney just state what that discovery is composed

14  of, it's medical records and your institutional file, okay?

15                      (OFF RECORD)

16              **THE COURT:**  Can you hear me Mr. Ryan?

17              **PLAINTIFF RYAN:**  Yes, sir.

18              **THE COURT:**  Before we got cut off, I was telling you

19  that the defense is -- has been ordered by the Court to send

20  you discovery.  And you heard what he stated, it's going to be

21  your medical records and your institutional file, okay?

22              **PLAINTIFF RYAN:**  Yes, sir.  Can I ask you a question,

23  sir?

24              **THE COURT:**  I might be able to answer it, go ahead.

25              **PLAINTIFF RYAN:**  Okay.  Is there any way that you can

1    produce all my documents from this case, the documents which I

2    filed with the Court, simply because MDOC will not -- they have

3    lost my paperwork and I have no paperwork; therefore, I have no

4    leg to stand on legally, you know?

5            **THE COURT:**  You would request that through the Clerk

6    of Court.

7            **PLAINTIFF RYAN:**  Okay.

8            **THE COURT:**  So file a written request for that

9    through the Clerk of Court.

10           **PLAINTIFF RYAN:**  Okay.

11           **THE COURT:**  And they will generate a cost estimate.

12           **PLAINTIFF RYAN:**  You see the problem, officer -- I'm

13   sorry.  You see the problem, Your Honor?  The cost estimate is

14   the problem, and --

15           **THE COURT:**  I don't know what the cost estimate is.

16           **PLAINTIFF RYAN:**  Oh, it's going to be quite a bit.

17   But the point is, all these things were taken from me.  And

18   what am I to do, Your Honor?  What am I to do?  I am simply

19   litigating a case -- this is only one case that I have going,

20   you know.  I have appeals going in multiple other cases, and

21   they simply took all my property and won't return it.  So what

22   am I to do, sir?  I don't have thousands of dollars for

23   transcripts.

24           **THE COURT:**  As far as this case, I don't know about

25   all the other litigations that you're suing other parties on,

1    but as far as this case you can file a request with the Clerk's
2    office.  That's the proper procedure.
3              **PLAINTIFF RYAN:**  Okay.
4              **THE COURT:**  All right?  So what I'm going to do is
5    set a discovery deadline, we'll go April the 25th.
6              **PLAINTIFF RYAN:**  Okay.
7              **THE COURT:**  And then a motion deadline of May the
8    9th.
9              **PLAINTIFF RYAN:**  All right.
10             **THE COURT:**  And if you happen to change your mind
11   with regard to consenting to a magistrate presiding over the
12   case, just simply put that in writing as well, and we'll send a
13   consent form.  Would the defense consent to a magistrate?
14             **MR. MAY:**  We would, Your Honor.
15             **THE COURT:**  So I'll let you mull over that.  But as
16   of this time forward, Judge Ozerden will be the judge on your
17   case, all right, Mr. Ryan?
18             **PLAINTIFF RYAN:**  Okay, thank you.
19             **THE COURT:**  Anything else required on the record?
20             **MR. MAY:**  Nothing from the defense, Your Honor?
21             **THE COURT:**  Anything further, Mr. Ryan?
22             **PLAINTIFF RYAN:**  No, sir.
23             **THE COURT:**  That will be the order of the Court.
24                  (HEARING CONCLUDED)
25

1

2                     CERTIFICATE OF COURT REPORTER

3

4            I, Sherri L. Penny, RPR, Official Court Reporter for

5     the United States District Court for the Southern District of

6     Mississippi, appointed pursuant to the provisions of Title 28,

7     United States Code, Section 753, do hereby certify that the

8     foregoing is a correct transcript of the proceedings audio

9     recorded and transcribed by me using the audio recording made

10    in this matter, and that same is a true and correct transcript

11    to the best of my ability and understanding.

12    Any inaudibles that occur in the transcript are a result of the

13    poor recording quality of the audio.

14           I further certify that the transcript fees and format

15    comply with those prescribed by the Court and the Judicial

16    Conference of the United States.

17

18

19

20           s/ *Sherri L. Penny*
             Sherri L. Penny, RPR
21           OFFICIAL COURT REPORTER

22

23

24

25